IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

VICKIE L. MYERS, )
 )
        Plaintiff, )
 )
v. ) 1:13CV898
 )
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security, )
 )
        Defendant. )

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Vickie Myers brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits under Title II of the Social Security Act (the "Act"). The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.    PROCEDURAL HISTORY

Plaintiff protectively filed an application for Disability Insurance Benefits ("DIB") on April 20, 2006, alleging a disability onset date of April 28, 2006. (Tr. at 108, 251-57.)[1] Her application was denied initially and upon reconsideration. (Tr. at 108, 109, 125-28, 131-33.) Thereafter, Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 134.) Following the subsequent hearing on December 2, 2008 (Tr. at 90-

---

[1] Transcript citations refer to the Sealed Administrative Transcript of Record [Doc. #8].

107), the ALJ issued a decision finding Plaintiff not disabled within the meaning of the Act (Tr. at 110-19). However, on October 19, 2010, the Appeals Council remanded Plaintiff's case for a new hearing, instructing the ALJ to (1) further consider Plaintiff's RFC and "provide appropriate rationale with specific references to evidence of record in support of the assessed limitations," and (2) "[o]btain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base." (Tr. at 122.) Following a second hearing on March 8, 2012, the ALJ again issued an unfavorable decision (Tr. at 15-39), and on August 9, 2013, the Appeals Council denied review, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

## II.     LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of . . . review of [such an administrative] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a

2

mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets omitted). "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons.

3

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first two steps, and establishes that the impairment "equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations," then "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual function[al] capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the

---

The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that pursuant to the administrative regulations, the "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal

4

claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the Commissioner to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

## III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her alleged onset date. (Tr. at 20.) She therefore met her burden at step one of the sequential evaluation process. At step two, the ALJ further determined that Plaintiff suffered from two severe impairments: fibromyalgia and depression. (Tr. at 21.) The ALJ found at step three that these impairments did not meet or equal a disability listing. (Tr. at 24.) Therefore, Plaintiff's RFC was assessed, and the ALJ determined that Plaintiff could perform medium work as defined in 20 C.F.R. § 404.1567(c) with myriad postural and

---

emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

5

environmental restrictions.[4] In pertinent part, the ALJ found that Plaintiff "could perform simple, routine tasks; follow short, simple instructions, make simple, work-related decisions; and adapt to a few work-place changes," and that "[s]he could have frequent interaction with the general public, coworkers, and supervisors." (Tr. at 26.) At step four of the analysis, the ALJ found, based on the testimony of a vocational expert, that Plaintiff's past relevant work exceeded her RFC. However, the ALJ determined at step five that Plaintiff could perform other jobs that exist in significant numbers in the national economy. (Tr. at 32.) Based on this finding, she concluded that Plaintiff was not disabled. (Tr. at 33.)

Plaintiff now argues that the ALJ failed to properly evaluate the opinions of Plaintiff's treating rheumatologist, Dr. Elliott Semble, and her treating psychiatrist, Dr. Ali Jarrahi.

---

[4] Following the first hearing, the prior ALJ found that the Plaintiff could perform "light work." However, following the second hearing, the ALJ concluded that Plaintiff could perform "medium work," with the additional restrictions noted above. In a footnote in her brief, Plaintiff contends that in deviating from the earlier finding of "light" work, the ALJ's decision was inconsistent with Acquiescence Ruling 00-1(4) and Albright v. Commissioner of SSA, 174 F.3d 473 (4th Cir. 1999). Under Acquiescence Ruling 00-1(4), "where a final decision of SSA after a hearing on a prior disability claim contains a finding required at a step in the sequential evaluation process for determining disability, SSA must consider such finding as evidence and give it appropriate weight in light of all relevant facts and circumstances when adjudicating a subsequent disability claim involving an unadjudicated period." AR 00–1(4) (S.S.A. Jan. 12, 2000); see also Lively v. Sec. of Health & Human Servs., 820 F.2d 1391, 1392 (4th Cir.1987) (noting that res judicata applies to Social Security disability cases and "prevents reappraisal of both the Secretary's findings and his decision in Social Security cases that have become final"); Albright, 174 F.3d at 477–78 (" To have held otherwise would have thwarted the legitimate expectations of claimants—and, indeed, society at large—that final agency adjudications should carry considerable weight."). However, in this case, the prior ALJ determination was vacated by the Appeals Council, and "the ALJ was not required to give weight to the findings made in the [earlier] decision, because it was vacated and not the final agency decision of the Commissioner." Monroe v. Colvin, No. 7:13-CV-74-FL, 2014 WL 7404136 at *2, *10 (E.D.N.C. Dec. 30, 2014); see also Batson v. Colvin, No. 7:14-CV-48-D, 2015 WL 1000791 (E.D.N.C. Mar. 5, 2015) ("Here, Albright and AR 00–1(4) did not require the second ALJ to consider the first ALJ's decision because that decision had been vacated, and thus no finding remained to be considered in the subsequent determination."). Moreover, in vacating the earlier decision, the Appeals Council decision specifically found a lack of function-by-function assessment supporting the "light work" determination. (Tr. at 121-22.) Thus, this issue was specifically before the ALJ for further consideration, and it was appropriate to reconsider the RFC on a more detailed, function-by-function analysis. Finally, the Court notes that the ALJ in this case specifically noted the prior "light work" determination, but noted that she was not required to adopt that determination, and then ultimately set out the reasons for adopting the RFC described above. (Tr. at 18, 29-31.)

Plaintiff also contends that the Appeals Council erred by declining to consider two additional medical opinions submitted with Plaintiff's administrative appeal.

A. Treating Physician Opinions

Plaintiff first claims that the ALJ failed to properly analyze the opinion of Drs. Semble and Jarrahi under 20 C.F.R. § 404.1527(c), better known as the "treating physician rule." The treating physician rule generally requires an ALJ to give controlling weight to the well-supported opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c). However, if a treating source's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record," it is not entitled to controlling weight. See Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5; 20 C.F.R. §§ 404.1527(c)(2); see also Craig, 76 F.3d at 590; Mastro, 270 F.3d at 178. Instead, the opinion must be evaluated and weighed using all of the factors provided in 20 C.F.R. § 404.1527(c)(2)(i)-(c)(6), including (1) the length of the treatment relationship, (2) the frequency of examination, (3) the nature and extent of the treatment relationship, (4) the supportability of the opinion, (5) the consistency of the opinion with the record, (6) whether the source is a specialist, and (7) any other factors that may support or contradict the opinion. However, opinions by physicians regarding the ultimate issue of whether a plaintiff is disabled within

7

the meaning of the Social Security Act are never accorded controlling weight because the decision on that issue is dispositive and reserved for the Commissioner alone. 20 C.F.R. § 404.1527(d).

In the case of Dr. Semble, Plaintiff argues that the ALJ's analysis failed to comply with Social Security Ruling 12-2p ("SSR 12-2p"), which provides guidance for evaluating fibromyalgia in the context of disability claims. See SSR 12-2p, 2012 WL 3104869 (July 12, 2012).[5] In particular, this Ruling requires the decision-maker to "consider a longitudinal record whenever possible" when assessing a claimant's RFC, "because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" 2012 WL 3104869, at *6. Plaintiff now contends that the ALJ erred in assigning no weight to Dr. Semble's opinion because his "medical records document the ebb and flow of the Plaintiff's symptoms as anticipated by SSR 12-2p." (Pl.'s Br. [Doc. #12] at 8.) However, as discussed below, this argument fundamentally misconstrues not only the ALJ's stated reasons for rejecting Dr. Semble's opinion, but also the nature of Dr. Semble's opinion itself.

On April 11, 2006, Dr. Semble completed a four-page North Carolina Retirement Systems form entitled "Medical Report for Disability Eligibility Review." (Tr. at 361-64.)[6] In that opinion, Dr. Semble posited that Plaintiff was "unable to work in any capacity" due to her "pain, fatigue, non-restful sleep, [and] cognitive and emotional issues." (Tr. at 361-62.)

---

[5] Because the Social Security Administration ("SSA") issued SSR 12-2p more than three months after the ALJ in the instant case issued his decision, the ruling was not yet in effect at the time of Plaintiff's hearing. However, as explained more fully below, the ALJ did not err in his treatment of Dr. Semble's opinion under either the SSA's regulations and rulings as they existed at the time of the hearing, or under the SSA's treatment of fibromyalgia claims as later clarified in SSR 12-2p.

[6] Although the ALJ correctly notes that the form is undated, Dr. Semble's treatment notes indicate that he filled out disability paperwork for Plaintiff on April 11, 2006, and the form itself indicates that date as the time of Plaintiff's most recent visit. (Tr. at 362, 408.)

8

He further opined that Plaintiff's condition was stable and permanent. (Tr. at 362.) However, Dr. Semble's opinion failed to specifically set out any restrictions or limitations necessitated by those symptoms, and did not otherwise specify how Plaintiff's symptoms, including pain, prevented her from working. Instead, it simply contained a conclusory statement asserting Plaintiff's permanent disability.

Contrary to Plaintiff's assertions, it is Dr. Semble's final opinion regarding the dispositive issue of disability, rather than his diagnosis or objective findings, that the ALJ assigned "no weight." (See Tr. at 30; Pl.'s Br. at 11.) The ALJ's decision as a whole clearly indicates that the ALJ did not dismiss or minimize Plaintiff's fibromyalgia as an impairment. In fact, she identified fibromyalgia as a severe impairment at step two, describing the findings of both Dr. Semble and Plaintiff's subsequent rheumatologist, Dr. Julio Bravo, at length in doing so. (Tr. at 21-22.) The ALJ then included limitations cited in Dr. Semble's treatment notes, including difficulties with short term memory and concentration, when assessing Plaintiff's RFC. (Tr. at 26, 408.) Moreover, at step three, the ALJ compared Plaintiff's symptoms to musculoskeletal and neurological listings under sections 1.00 and 11.00, and Plaintiff does not challenge the ALJ's finding that her fibromyalgia did not meet or equal a listing. (Tr. at 24.)

Most notably, Plaintiff does not directly contest the ALJ's finding that her description of the extent of her limitations was less than fully credible. Rather, she approaches the issue indirectly, contending that her testimony regarding good and bad days was consistent both

9

Case 1:13-cv-00898-WO-JEP   Document 19   Filed 07/16/15   Page 9 of 20

with fibromyalgia as described in SSR 12-2p[7] and with Dr. Semble's opinion. (Pl.'s Br. at 13-15.) However, as noted above, the ALJ accepted Dr. Semble's diagnosis and a number of the limitations he chronicled in his treatment notes. The ALJ simply concluded that the objective medical findings, the other medical reports, and the activity level Plaintiff recounted in over twenty pages of testimony was inconsistent with her assertions that her fibromyalgia was so severe that it prevented her from leaving her couch one or two days each week. (Tr. at 29, 73.) Significantly, all records, including Dr. Semble's treatment notes, indicate that Plaintiff remained independent in terms of activities of daily living throughout the time period in question. Further, during more than five years of regular doctor's visits, Plaintiff's medical records identify only two instances in which her physical and social activities were severely restricted due to fibromyalgia symptoms. (Tr. 405, 504, 505, 506, 507, 508, 509, 510, 511, 512, 513, 514, 515, 569, 570, 571, 587, 606, 613-53.) Overall, the ALJ found that Plaintiff's "medications help reduce the pain she experiences as a result of [fibromyalgia]" and that her "extensive activities of daily living do not support the extent of limitation she alleges." (Tr. at 28-29, 55-77, 540, 622, 636.) See also Whitney v. Colvin, No. CA 9:14-1166-TMC, 2015 WL 3969323 (D.S.C. June 30, 2015) (collecting cases for the proposition that "a claimant is not entitled to disability just because they suffer from

---

[7] As noted above, SSR 12-2p post-dates the ALJ's decision. However, Ruling 12-2p mirrors SSR 96-7p's more general guidelines for assessing credibility, and Ruling 12-2p describes the following credibility analysis for fibromyalgia patients: "If objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms, we consider all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms. As we explain in SSR 96-7p, we will make a finding about the credibility of the person's statements regarding the effects of his or her symptoms on functioning." 2012 WL 3104869, at *5; see also SSR 96-7p. The Court notes that the ALJ explicitly considered these factors in the present case.

fibromyalgia," and further considering specific findings in the plaintiff's medical records to determine whether the plaintiff was "as physically limited as she claimed"). Determinations regarding credibility and the weight to give to various medical opinions are for the ALJ to make in the first instance, and in the present case, the Court concludes that substantial evidence supports the ALJ's credibility determination[8] and the ALJ's treatment of Dr. Semble's opinion.[9]

---

[8] An ALJ's decision must "contain specific reasons for the finding on credibility, supported by the evidence in the case record." SSR 96-7p; see also 20 C.F.R. § 404.1529. Toward this end, the Fourth Circuit has provided a two-part test for evaluating a claimant's statements about symptoms. "First, there must be objective medical evidence showing 'the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged.'" Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996) (citing 20 C.F.R. § 404.1529(b)). If the ALJ determines that such an impairment exists, the second part of the test then requires him to consider all available evidence, including Plaintiff's statements about her pain, in order to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." Craig, 76 F.3d at 596. Notably, while the ALJ must consider Plaintiff's statements and other subjective evidence at step two, he need not credit them "to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers." Id. This approach facilitates the ALJ's ultimate goal, which is to accurately determine the extent to which Plaintiff's pain or other symptoms limit her ability to perform basic work activities. Thus, a plaintiff's "symptoms, including pain, will be determined to diminish [her] capacity for basic work activities [only] to the extent that [her] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4). Relevant evidence for this inquiry includes Plaintiff's "medical history, medical signs, and laboratory findings" Craig, 76 F.3d at 595, as well as the factors set out in 20 C.F.R. § 404.1529(c)(3), including "(i) [Plaintiff's] daily activities; (ii) The location, duration, frequency, and intensity of [Plaintiff's] pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or [has] taken to alleviate [her] pain or other symptoms; (v) Treatment, other than medication, [Plaintiff] receive[s] or [has] received for relief of [her] pain or other symptoms; (vi) Any measures [Plaintiff] use[s] or [has] used to relieve [her] pain or other symptoms (e.g., lying flat on [her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms." Where the ALJ has considered these factors and has heard Plaintiff's testimony and observed her demeanor, as in this case, the ALJ's credibility determination is entitled to deference.

[9] Plaintiff also appears to raise a challenge to the "significant weight" given to a consultative examiner, Dr. Egnatz. Dr. Egnatz undertook a consultative examination in December 2011. Plaintiff first objects to the ALJ's decision to order the consultative examination. However, requesting such examinations is an appropriate part of developing the record. See 20 C.F.R. § 404.1519a(b) (noting that a consultative examination may be ordered "when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim"). Plaintiff also challenges the consultative examination based on the contention that "[u]nder SSR 12-2p, if a consultative evaluation is ordered in a fibromyalgia case, then the medical source who conducts the evaluation is supposed to have access to longitudinal information about the

11

Plaintiff's challenge regarding her treating psychiatrist, Dr. Jarrahi, fails for similar reasons. As with Dr. Semble's assessment, Dr. Jarrahi's opinion that Plaintiff "will not be able to handle the stresses of a full time job because of her difficulties with coping and her numerous physical and emotional discomforts" (Tr. at 611) goes to the ultimate issue of disability and, as such, was not entitled to controlling weight. 20 C.F.R. § 404.1527(d). In according this opinion little weight, the ALJ additionally noted that Dr. Jarrahi's finding of total disability was "not supported by any other medical report," and "not supported by [Plaintiff's] reported activities of daily living." (Tr. at 31.) Dr. Jarrahi's September 15, 2011 opinion letter lists Plaintiff's diagnoses as major depression, anxiety, fibromyalgia, and sleep apnea, and chronicles her symptoms as "high anxiety and depression with periods of feeling low and hopeless, having apathy, lethargy[,] and crying spells." (Tr. at 611.) He also notes her treatment with various anti-depressants and anti-anxiety medications. However, Dr. Jarrahi never ties Plaintiff's symptoms to any functional limitations, nor does he specify to what degree, if any, Plaintiff might be limited in terms of activities of daily living, social functioning, concentration, persistence, or pace.

Moreover, Plaintiff points to nothing in Dr. Jarrahi's treatment notes to support the level of incapacitation he opines, and the Court's review of these records, like that of the ALJ, reveals none. (See Tr. at 31, 540-68.) During Dr. Jarrahi's initial evaluation, Plaintiff reported that, secondary to pain, "[s]he began experiencing a lot of irritability, poor

---

claimant." (Pl. Resp. at 6.) However, in this case, the consultative examination by Dr. Egnatz in December 2011 included a review of 20 pages of medical records, including records from Plaintiff's primary care physician and from Dr. Semble. (Tr. at 667.) Dr. Egnatz also took a history from Plaintiff and relied in large part on Plaintiff's own reports. (Tr. at 668-670.) Therefore, it appears that longitudinal information was considered and included in this evaluation.

concentration, making a lot of mistakes[,] and having a lot of difficulty managing people she was supervising" while working as a crime scene technician, and that these factors led her to stop working and file for disability. (Tr. at 540-41.) The ALJ agreed, finding that Plaintiff could not return to her past relevant work. (Tr. at 31.) The ALJ also acknowledged the severity of Plaintiff's depression, including it as a severe impairment at step two (Tr. at 21-23) and considering whether it met or equaled the listing requirements for depression at step three (Tr. at 24-25). Plaintiff does not dispute the ALJ's finding that her depression failed to meet the criteria of Listing 12.04.

Plaintiff now claims that Dr. Jarrahi's opinion is consistent with certain objective tests administered by Dr. Catherine Clodfelter, a neuropsychologist, in July 2006. (Pl.'s Br. at 12 (citing Tr. at 402-04).) Plaintiff's self-reporting depression inventory test did, in fact, indicate severe depression, and her score on the self-reporting Neuropsychological Impairment Scale indicated "a very high level of impairment in her daily life attributable to cognitive dysfunction." (Tr. at 22, 402.) However, Dr. Clodfelter's further testing revealed "no measurable cognitive dysfunction" and also suggested that Plaintiff "is overestimating the amount of cognitive impairment she actually has." (Tr. at 402, 403.) Dr. Clodfelter further noted that Plaintiff's very high score on the Affective Disorder Scale demonstrated that "affective disorder, such as anxiety or depression, might be resulting in the over-reporting of neuropsychological symptoms" and that "depression appears to be playing much more of a role in [Plaintiff's] difficulty functioning on a daily basis than are any cognitive problems." (Tr. at 22, 402-03.) Dr. Clodfelter issued no opinion as to the impact of Plaintiff's

13

depression on her ability to work, and, as set out above, there is no evidence that the ALJ minimized the severity of Plaintiff's depression.

Notably, the state agency and consultative examiners had the benefit of evaluating Dr. Clodfelter's test results along with the medical evidence as a whole, and the ALJ gave significant weight to their opinions. (Tr. at 22, 30-31, 463-65, 655-63.) The ALJ then included the posited restrictions in Plaintiff's RFC, limiting her to "simple, routine tasks" and "short, simple instructions" with "simple, work-related decisions" and "few work-place changes" in light of findings that she had mild to moderate difficulties in concentration. The ALJ also limited Plaintiff to no more than "frequent interaction with the general public, coworkers, and supervisors" based on findings that she had mild limitations in social functioning. Plaintiff provides no evidence that these limitations fail to address her previous work difficulties as expressed to Dr. Jarrahi, or that the record as a whole merited greater limitations. Accordingly, substantial evidence supports the ALJ's treatment of Dr. Jarrahi's opinion.

B. Evidence Submitted to the Appeals Council

Plaintiff next challenges the Appeals Council's handling of two additional medical opinions that were submitted for the first time with her administrative appeal. These medical opinions were obtained in July and August 2012, after Plaintiff's date last insured ("DLI") of December 31, 2011, and after the ALJ's decision of April 16, 2012.

Under the applicable regulations, the Appeals Council need only consider additional evidence if it is "(a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." Wilkins v. Secretary of Health & Human Servs., 953 F.2d 93, 95-96

(4th Cir. 1991) (citing Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990)); see also 20 C.F.R. § 404.970(b). "Evidence is new within the meaning of this section if it is not duplicative or cumulative. Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." Id. (citations omitted). Here, the Appeals Council stated that it had "looked at" the additional medical opinions submitted by Plaintiff, but concluded that "[t]he Administrative Law Judge decided your case through December 31, 2011. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before December 31, 2011." (Tr. at 2.) The Appeals Council also considered other arguments and contentions submitted by Plaintiff, and ultimately denied Plaintiff's request for review. While not entirely clear, it appears that the Appeals Council either (1) concluded that the additional medical opinions were not material under § 404.970(b) because the opinions did not affect the pre-DLI disability determination and therefore would not have changed the outcome; or (2) considered the additional medical opinions but concluded that they did not warrant granting review because they did not affect the pre-DLI disability determination.[10]

---

[10] The Fourth Circuit has directly addressed the nature of this Court's review if the evidence is accepted by the Appeals Council. See Meyer v. Astrue, 662 F.3d 700 (4th Cir. 2011). If the Appeals Council instead declines to accept the additional evidence, some courts in this circuit treat an appeal of that issue under "sentence six" of 42 U.S.C. § 405(g), rather than "sentence four." See, e.g., Barts v. Colvin, No. 4:13-CV-23, 2014 WL 3661097 (W.D. Va. July 22, 2014) ("When a claimant presents additional evidence that the Appeals Council did not 'consider' in accordance with 20 C.F.R. § 404.970(b), courts in this district review such evidence to determine whether it requires remand under sentence six of 42 U.S.C. § 405(g). . . . Typically in sentence-six cases, the plaintiff submits the additional evidence to this Court because the Appeals Council returned it to him unexamined. . . . . A court's authority under sentence six is limited to remanding the case for 'additional evidence to be taken.'" (internal citations and quotations omitted)) (collecting cases). This Court need not resolve this issue further in the present case, as the Court ultimately concludes that substantial evidence supports the administrative decision in this case and that the Appeals Council did not err in its determination, as discussed *infra*.

15

Citing Bird v. Comm'r of Soc. Sec., 699 F.3d 337, 340-41 (4th Cir. 2012), Plaintiff challenges the Appeals Council's determination and contends that medical evidence that post-dates the date last insured may be considered where it is relevant to prove disability prior to that date. Specifically, the Fourth Circuit in Bird concluded "that post-DLI medical evidence generally is admissible in [a] SSA disability determination in such instances in which that evidence permits an inference of linkage with the claimant's pre-DLI condition." Bird, 699 F.3d at 341 (citing Moore v. Finch, 418 F.2d 1224, 1226 (4th Cir. 1969)). Plaintiff contends that the July and August 2012 medical opinions effectively link to her pre-DLI condition, mandating their consideration by the Appeals Council.

With respect to these contentions, the Court notes that it is clear under Bird that "[m]edical evaluations made after a claimant's insured status has expired are not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's DLI." Bird. 699 F.3d at 340. However, it is also clear that to establish eligibility for DIB, "a claimant must show that he became disabled before his DLI." Id. Even if later evaluations are considered, the relevant focus remains on the claimant's condition prior to the DLI. Indeed, if the hearing occurs after the DLI, testimony at the hearing is only relevant to the extent it sheds light on pre-DLI limitations. See, e.g., Bird 699 F.3d at 342 (noting relevance of testimony related to pre-DLI time period); Davis v. Astrue, No. 2:10CV30, 2011 WL 399956 (N.D.W. Va. Jan. 11, 2011) (noting lack of evidence where DLI passed two years prior to hearing, and claimant was questioned at hearing only regarding her present limitations).

16

Case 1:13-cv-00898-WO-JEP   Document 19   Filed 07/16/15   Page 16 of 20

With respect to the additional medical opinions at issue here, the Court notes that after the ALJ issued her unfavorable decision on April 16, 2012, Plaintiff's counsel sent letters to both Dr. Bravo and Dr. Jarrahi. In those letters, both dated July 30, 2012, counsel requested that both physicians review their notes and answer a series of questions related to Plaintiff's conditions. (Pl.'s Br. Attachments 1 and 2.) The first question in each letter asked the doctors about Plaintiff's "<u>current</u> diagnosis, prognosis, and treatment." (<u>Id.</u> (emphasis added).) None of the questions or answers included retrospective language or in any way indicated that the physicians' responses were directed to the time period prior to December 31, 2011, Plaintiff's DLI. <u>See, e.g.</u>, <u>Manning v. Colvin</u>, No. 8:12-CV-1478-DCN, 2014 WL 1315228 (D.S.C. Mar. 30, 2014).

In addition, specifically as to Dr. Bravo's statement, the narrative in the letter drafted by Plaintiff's counsel noted that Plaintiff "suffers from fibromyalgia and osteoarthritis." Dr. Bravo then answered questions regarding Plaintiff's hand pain linked to osteoarthritis, with related handling limitations, as of August 14, 2012. However, there are no references to osteoarthritis in Dr. Bravo's treatment notes in the record. Plaintiff cites to treatment notes that include references to Plaintiff's complaints of pain in her hands. (Tr. at 625, 629, 632, 635, 636.) However, all of this evidence was considered by the ALJ, and Dr. Bravo's later statement regarding the status of this condition 8 months after the DLI does not affect that analysis. <u>See also</u> HALLEX I-3-3-6 (outlining internal SSA rules for consideration of new and material evidence, and noting that "[e]vidence is not related to the period at issue when the evidence shows: A worsening of the condition after the expiration of a DLI in a title II disability insurance benefits claim."). Therefore, to the extent Plaintiff attempts to add new

17

evidence from Dr. Bravo regarding osteoarthritis in Plaintiff's hands, even if that evidence is considered, there is no basis to support a determination that the condition was disabling or resulted in limitations beyond those included in the RFC, prior to the December 31, 2011 DLI.  See also Emrich v. Colvin, __ F. Supp. 2d ___, 2015 WL 867287 (M.D.N.C. Mar. 2, 2015) (noting that Bird was not applicable where there was "substantial evidence in the record" concerning the claimant's pre-DLI condition, and collecting similar cases).  Finally, Dr. Bravo's statement also notes certain symptoms that "could be caused" by Plaintiff's fibromyalgia, and notes that it is "reasonable" for her to have "bad days."  However, these questions are simply efforts to boost Plaintiff's credibility, and as worded, relate only to the determination of whether the impairment "could reasonably be expected to produce the pain or other symptoms alleged," which is step one of the credibility analysis outlined by the Fourth Circuit in Craig v. Chater, 76 F.3d at 594.  However, in this case, the ALJ specifically found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," (Tr. at 27) under step one of Craig.  The ALJ then proceeded to the second step of the Craig analysis, and based her credibility determination on a consideration of all available evidence, including Plaintiff's statements about her pain, in order to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work."  Thus, the additional information provided by Dr. Bravo, to the extent it relates to step one of the Craig analysis, would not affect the ALJ's determination in this case.

With respect to Dr. Jarrahi's statement, Dr. Jarrahi repeated his prior diagnosis of depression and anxiety, repeated his prior opinion that Plaintiff could not handle the stress

18

of a full time job, and answered similar questions as to whether it was "reasonable" for Plaintiff to have "bad days." This opinion does not itself relate back to the pre-DLI period, does not have any material effect on the credibility determination for the same reasons noted above, and simply repeats a prior opinion that was specifically addressed and given little weight by the ALJ.

Ultimately, even considering these additional medical opinions, the ALJ's determination is supported by substantial evidence, and the Appeals Council did not err in concluding that the additional medical opinions were not material or otherwise did not warrant granting review. Having so concluded, the Court recommends that the Commissioner's decision be affirmed. [11]

---

[11] In Plaintiff's Response Brief, she also contends that the ALJ did not conduct a full and fair hearing. Plaintiff notes in particular that during her responses to counsel's questioning when she was describing what her doctors had told her, the ALJ interrupted and said, "I've got your medical records. I don't need you to give me a diagnosis so just answer his questions. Thank you though." Plaintiff also notes that after counsel questioned her regarding her fibromyalgia and depression, the ALJ said to counsel, "Anything else you need to cover because we covered the depression and we covered the fibromyalgia?" Counsel responded, "I'm just trying to flush out all the different, you know --" and the ALJ stated, "And she's covered that in great detail and I've got all the medical records from back to 2006. Anything else that she needs to add that she's not covered with you or with me?" Counsel responded, "I guess not, Your Honor," and the ALJ said "Well, if there is you've got five minutes to finish it." Plaintiff contends that by taking this position, the ALJ failed to allow her to fully present her claims. However, at that point in the exchange, counsel had not articulated what he wanted to add that had not yet been covered. Moreover, counsel did subsequently raise his concern directly, telling the ALJ "you cannot cut off the claimant's testimony like that, Your Honor." In response, the ALJ agreed, but observed that Plaintiff was just "repeating things she's said before so the strongest things you need to add now is your opportunity." The ALJ did not cut off the testimony again. In the circumstances, the Court concludes that while there may have been some misunderstanding between the ALJ and counsel, it appears that the ALJ was attempting simply to avoid repetitive testimony, and nevertheless allowed counsel the opportunity to identify what else he wanted to provide, and then after counsel voiced his concern at being cut off, allowed counsel to continue without interruption.

19

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Judgment Reversing the Commissioner [Doc. #11] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #16] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 16th day of July, 2015.

/s/ Joi Elizabeth Peake
United States Magistrate Judge